NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0255n.06

No. 21-5673

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 27, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| INSITE PLATFORM PARTNERS, INC.; NORTH AMERICAN SATELLITE CORPORATION; RICHARD HUMPHREY, | ) ) ) ) | |
| Plaintiffs - Appellants, | ) ) | ON APPEAL FROM UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| v. | ) ) | |
| COMTECH MOBILE DATACOM CORPORATION, | ) ) | |
| Defendant-Appellee. | ) ) ) | OPINION |

Before: SILER, LARSEN, and MURPHY, Circuit Judges.

SILER, Circuit Judge. Insite Platform Partners Incorporated, North American Satellite Corporation, and Richard Humphrey appeal the district court's orders granting summary judgment on behalf of Comtech Mobile Datacom Corporation and denying their subsequent motion for reconsideration. For the following reasons, we **REVERSE IN PART AND AFFIRM IN PART** the order granting summary judgment, and we **AFFIRM IN PART** the order denying reconsideration and **DENY IN PART** the appeal of that order.

## I.

North American Satellite Corporation (NASCorp) is the original developer of a product called the SkyTracker, a monitoring device. It uses satellite technology to measure fuel levels inside propane tanks. In 2009, NASCorp contracted with Comtech Mobile Datacom Corporation (Comtech) to design and manufacture the third generation SkyTracker, called the SkyTracker III.

Comtech also agreed to provide monthly monitoring services for customers who purchased the SkyTracker III.

After completing the design for NASCorp, Comtech hired two subcontractors to manufacture the device: Advanced Assembly (AA), which manufactured the printed circuit boards installed into the device, and SinotechUSA, Inc. (Sinotech), which produced the plastic enclosures and assembled the final product; these subcontractors were subject to some form of nondisclosure agreements (NDA) with Comtech.

The 2009 contract between NASCorp and Comtech expired in late 2012, and over the next several months the parties negotiated a new agreement—one winding down their relationship. On May 31, 2013, the CEO of NASCorp, Richard Humphrey, emailed a Comtech representative to follow up on the parties' negotiations. Humphrey explained (1) NASCorp needed the engineering files it had paid Comtech to develop, (2) Comtech's subcontractors would need to be released from their "NDAs" to work directly with NASCorp, and (3) Comtech needed to transfer the remaining SkyTracker III inventory to NASCorp. Then on June 18, 2013, Humphrey emailed Comtech a list of the engineering files NASCorp needed. The list included, among other things, hardware and software files, accompanying documents, and testing fixtures for the SkyTracker III. Humphrey also requested again that AA and Sinotech be released from their "NDAs" so they could begin the "next tranche" of SkyTracker III production. One day later, on June 19, 2013, Comtech employees began locating the items on Humphrey's list.

On June 25, 2013, the parties signed the "CONTRACT SETTLEMENT MODIFICATION" (the Agreement). The Agreement (1) required Comtech to "release all SkyTracker III engineering drawings and related information to NASCorp," (2) required Comtech to "provide written notice to all subcontractors involved in the manufacture of SkyTracker units

and authorize the subcontractors to work with NASCorp directly upon the execution of this agreement," and (3) provided a structured plan for NASCorp to purchase Comtech's remaining SkyTracker III inventory and to settle outstanding invoices. After the parties signed the Agreement, Comtech employees compiled all the SkyTracker III electronic files from Comtech's project-management database. These files were then burned onto a CD and, Comtech claims, shipped to NASCorp, along with a laptop and a SkyTracker III test fixture. When Humphrey received the package on July 5, 2013, however, he claims it only contained the laptop and test fixture. Humphrey maintains that he never received a CD of any SkyTracker III files.

Comtech released AA and Sinotech from their NDAs in late July 2013. NASCorp and Comtech eventually modified the Agreement in October 2013, and the two remained in sporadic communication throughout the rest of year. During early 2014, NASCorp began reaching out to AA and Sinotech to establish new manufacturing arrangements.

Then on June 4, 2014, Comtech sent NASCorp a dunning letter demanding NASCorp pay $135,404.20 in overdue payments. Around this same time, Humphrey was also visiting NASCorp's new circuit board manufacturer, Creative Electronics and Software, Inc. (CES). NASCorp had decided to work with CES instead of AA after AA declined to extend NASCorp credit on a new manufacturing arrangement. Prior to his visit, Humphrey provided CES with the package that Comtech had shipped to him. When Humphrey arrived, CES notified him that NASCorp didn't possess several important SkyTracker III files. After learning this, Humphrey responded to Comtech's dunning letter to complain that Comtech breached the Agreement.

Humphrey was eventually able to obtain a few engineering files from AA, which were necessary for CES to fabricate the circuit boards, and Humphrey acknowledged that AA and Sinotech possessed all files necessary to manufacture the SkyTracker III device. But by late 2014,

the SkyTracker III was beginning to experience several other problems. One of the main problems CES identified was that the SkyTracker III battery, which was designed to go into "sleep mode" and last for several years, remained "awake" and resultantly lasted only a few months. Because CES couldn't fix the battery, CES and NASCorp sought out Execution Analytics (a product development firm) to review the package Humphrey had provided CES and to determine whether NASCorp had all the files necessary to produce reliable SkyTracker III devices.

CES never located a CD within the package, and, after reviewing all the items Humphrey provided, CES and Execution Analytics determined NASCorp was missing several important files. Chief among them was the SkyTracker III source code. Source code is an electronic file of computer-commands written in programming language that is readable by humans. Software engineers use these readable commands to generate the unreadable computer code, which directs the activity of an electronic device. CES determined it could not resolve the battery issue without, at least, the source code. CES also learned that Globalstar, NASCorp's modem producer, had discontinued their current modem for a new model. CES notified Humphrey that its engineers would be unable to incorporate the new modem without upgrading the SkyTracker III circuit board, which likewise required access to the source code. Ultimately, NASCorp never received the source code from Comtech.

NASCorp continued to manufacture and sell some SkyTracker III devices for roughly the next two years. Throughout this period, NASCorp often had to refurbish returned devices on warranty. By late 2016, NASCorp and Execution Analytics decided to design the next generation SkyTracker—the SkyTracker IV—and in September of 2017, NASCorp terminated the SkyTracker III series. Humphrey maintains NASCorp was forced to develop the SkyTracker IV

because Comtech never provided proprietary information essential for a functioning SkyTracker III—primarily, the SkyTracker III source code.

Humphrey also accuses Comtech of pirating its SkyTracker III devices. Humphrey admittedly has never seen a pirated unit for sale and does not know how many units might exist. He notes, however, that after the parties entered into their 2009 agreement, Comtech ordered 3,700 enclosures from Sinotech, and yet Sinotech only assembled 2,323 SkyTracker III devices—leaving a surplus of 1,377 enclosures. Comtech cannot account for the additional enclosures but explains that manufacturers are often required to purchase more parts than they ultimately assemble. Humphrey also discovered several invoices from this time that showed that roughly the same number of two other component parts had been delivered to a recipient, "North American Satellite," at an address NASCorp had already vacated.

NASCorp; Richard Humphrey; and NASCorp's assignee, Insite Platform Partners, Incorporated, (hereinafter collectively "NASCorp") sued Comtech on March 26, 2019, for several claims arising out of the Agreement and under the Lanham Act. Comtech counterclaimed for breach of contract. It also moved to dismiss NASCorp's claims. The district court granted in part and denied in part Comtech's motion to dismiss and dismissed all NASCorp's claims save two: its Tennessee breach of contract claim, and its false-designation-of-origin claim under the Lanham Act. Comtech later moved for summary judgment, and the district court granted that motion in full. NASCorp moved for reconsideration, and the district court denied that motion. NASCorp appealed both orders. The parties settled Comtech's counterclaim for breach of contract. For the following reasons, we reverse in part and affirm in part the order granting summary judgment, and we affirm in part the order denying reconsideration and deny in part the appeal of that order.

**STANDARD OF REVIEW**

We review a grant of summary judgment de novo, "construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). The moving party bears the initial burden of "identifying those parts of the record that demonstrate the absence of any genuine issue of material fact." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

**DISCUSSION**

**A. Breach of Contract**

NASCorp claims Comtech breached the Agreement's provision that required Comtech to "release all SkyTracker III engineering drawings and related information to NASCorp." We apply Tennessee law to this claim as the district court did, and the parties have never objected. Under Tennessee law, a breach-of-contract claimant must prove "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

Below, the parties agreed that Comtech gathered "all SkyTracker III engineering drawings and related information" and compiled these so-called "engineering files" onto a CD. NASCorp argued there was still a dispute about whether Comtech "release[d]" the engineering files "to NASCorp," as Humphrey testified that he never received that CD. The district court granted summary judgment nonetheless because it found that Comtech "deliver[ed] the requisite engineering [files]" and held that any dispute about the contents of the package was immaterial, as Comtech could have satisfied this obligation in more than one way. Specifically, the district court held that Comtech "release[d]" the engineering files when it released AA and Sinotech from their NDAs and allowed them to continue manufacturing the SkyTracker III for NASCorp, especially

considering NASCorp admitted the subcontractors possessed all the files necessary to "manufacture" the device.

On appeal, both parties disagree about Comtech's obligation under this provision. When the district court granted summary judgment it implicitly interpreted Comtech's obligation as inclusive of two alternative duties: a duty to transfer engineering files to NASCorp *or* a duty to send releases notifying the subcontractors of their right to continue manufacturing the SkyTracker III for NASCorp. NASCorp maintains "release" only encompassed the former interpretation; Comtech maintains it unambiguously encompassed the latter. We must therefore determine what it means to "release" the engineering files "to NASCorp."

The interpretation of a contract is question of law. *BSG, LLC v. Check Velocity, Inc.*, 395 S.W.3d 90, 92 (Tenn. 2012). We are required to "ascertain and give effect to the parties' intent." *Id.* If contractual language is clear and unambiguous, we must interpret it "according to its plain terms and ordinary meaning." *Id*. at 93. When a term is ambiguous, the court must "resort to other rules of construction," *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002), including a reliance on extrinsic evidence, *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 697–98 (Tenn. 2019). Only if the ambiguity remains does the meaning of a contract become a question of fact. *Planters*, 78 S.W.3d at 890.

Comtech relies on Black's Law Dictionary, which defines "release" to mean, among other things, a "relinquishment or concession of a right, title, or claim." *Release*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Webster's Dictionary adds: "to give up in favor of another," and "to give permission for publication, performance, exhibition, or sale of." *Release*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/release (last visited May 27, 2022). The Oxford English Dictionary also adds: "[t]o make over or transfer . . . property . . . to another."

*Release*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/161859?rskey=
VGsAA2&result=2&isAdvanced=false#eid (last visited May 27, 2022).

In light of these definitions, "release" is ambiguous; it equally encompasses two notions. As Comtech argues, release may mean that Comtech was required to "relinquish" "in favor of" the subcontractors its "right" to use the engineering files for NASCorp. Or, as NASCorp maintains, release may mean that Comtech was required to "transfer" the engineering files "to" NASCorp.

But this ambiguity diminishes once we consider the entire contract, as we must. *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012). Comtech's favored interpretation of "release" would render the entire provision superfluous. Comtech's purported obligation to "send releases" is encompassed by a subsequent provision, which required Comtech to "provide written notice to all subcontractors involved in the manufacture of SkyTracker units and authorize [them] to work with NASCorp directly." Tennessee courts avoid construing contractual language in a way that renders a provision surplusage. *See Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). This subsequent provision counsels against adopting a definition of "release" that obligates Comtech to "relinquish" to the subcontractors its right to use the engineering files for NASCorp because the subsequent provision already imposed that obligation.

Comtech asserts the subsequent provision only obligated Comtech to allow the subcontractors to *work* with NASCorp. Comtech maintains the "release" provision separately required Comtech to allow the subcontractors to *use* the engineering files *for* NASCorp. We aren't aware if this dichotomy-of-restrictions originally was imposed by the subcontractor's NDAs; we do not have those agreements. But such hairsplitting does not seem to appear in *this* agreement; indeed, how else were the "subcontractors involved in the manufacture of SkyTracker units" supposed to work "with NASCorp directly," if not by the right to *use* the engineering files *for*

NASCorp? And this supposed distinction is belied by the "release" provision as well, which required Comtech to release the engineering files "to" NASCorp, not to the subcontractors "for" NASCorp.

The contract, when read as a whole, is likely unambiguous in requiring Comtech to send the engineering files to NASCorp. Even if there was any lingering confusion about the contract's meaning, though, we would still come to the same conclusion in light of the extrinsic evidence. *Cf. Mass. Mut. Life Ins. Co. v. RCS – Germantown I, LLC*, 858 F. App'x 900, 905 (6th Cir. 2021). Comtech fails to show the subcontractors ever possessed *all* the engineering files Comtech was obligated to "release" when it allowed them to continue working with NASCorp. So to fulfill its obligation to release "*all* SkyTracker III engineering drawings and related information to NASCorp," Comtech was undisputedly required to *transfer* those files to NASCorp—not simply to allow the subcontractors to continue manufacturing the SkyTracker III and to use whatever files they may have possessed at the time.

When it comes to the circumstances before the Agreement, we are "permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract."[1] *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006). The Agreement includes an integration clause, which Tennessee courts recognize "indicates the parties' intent that the contract[] embod[ies] their complete and exclusive agreement." *Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 697.

---

[1]Although the parol evidence rule generally operates differently depending on whether the contract is governed by the common law or Tennessee's version of the U.C.C., it is widely recognized to operate the same when it is being used as it is here: an interpretative aid for ambiguous language. *See* 21 Steven W. Feldman, *Tennessee Practice Series Contract Law and Practice* § 8:51 (2d ed.), Westlaw (database updated Sept. 2021) ("[B]oth the UCC and common law parol[-]evidence [bar] do[es] not apply when the extrinsic proof does not contradict or alter the terms of the contract.").

But we may still consider "extrinsic evidence of context . . . to interpret the contractual language in line with the parties' intent," provided that it is not used to "vary, contradict, or supplement the contractual terms." *Id.* When the parties rely on the circumstances after the Agreement, they evoke the corollary rule of practical construction. This rule, "long recognized and applied" in Tennessee, is that "the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered." *Hamblen County. v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn. 1983); *see also Williamson Cnty. Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 553 (Tenn. Ct. App. 1998) ("The construction placed on an agreement by the parties is a valuable construction tool where the agreement is ambiguous.").

In support of its interpretation that release means "send releases" and not "transfer," Comtech relies on two pieces of evidence. First, Comtech points to an email from an AA representative, responding to Comtech's email notifying AA that Comtech is ceasing production of the SkyTracker III and that "NASCorp may be contacting you in the future . . . ." AA's email in response requested that Comtech provide a formal letter to AA stating whether Comtech "*will be releasing all files for the SkyTracker* . . . and if there are any limitations on what NASCorp can do[.]" Second, in its statement of undisputed facts below, Comtech asserted the subcontractors "had all of the files necessary to manufacture SkyTracker IIIs," and NASCorp admitted this fact without reservation. Comtech argues this evidence shows the subcontractors already possessed all the engineering files Comtech was obligated to "release" to NASCorp under the Agreement. In light of this evidence, therefore, Comtech maintains the Agreement required Comtech only to allow the subcontractors to (1) continue working with NASCorp and (2) continue using the engineering files for NASCorp.

Comtech's reliance on this evidence is misplaced, however, as it obscures who possessed what. Take first, AA, Comtech's circuit board manufacturer. In his June 18, 2013, email to Comtech listing the files NASCorp needed, Humphrey noted how one of the items on the list—which included Gerber files, BOM files, and X/Y or Pick and Place files—already had been requested by AA. Gerber files are photographs of the circuit board patterns for each layer of a circuit board, BOM files are "bill of materials" files that provide a list of parts necessary to fabricate a circuit board, and X/Y or Pick and Place files are instructions for placing component parts onto a circuit board. *These* are the files AA's representative was referencing in the email to Comtech above. These were also the files that AA's corporate designee referenced when he testified AA already possessed "all . . . the files [it] needed . . . to manufacture" the circuit boards, *and* that Humphrey admitted he eventually received from AA after he hired CES, which CES used to manufacture the SkyTracker III circuit boards. And as for Sinotech, Comtech's subcontractor that produced the device's plastic enclosures, its corporate designee explained, "[t]here weren't detailed instructions or documentation" for production.

Comtech cited this testimony for its claim—which NASCorp admitted—that the subcontractors "had all of the files necessary to manufacture the SkyTracker IIIs." But importantly neither subcontractor testified it possessed the SkyTracker III source code, and yet Comtech acknowledges the phrase "all SkyTracker III engineering drawings and related information" includes the SkyTracker III source code. Comtech therefore conflates NASCorp's relatively benign admission that the subcontractors "had all of the files necessary to manufacture the SkyTracker IIIs" with Comtech's contractual obligation to "release all SkyTracker III engineering drawings and related information." The former references a distinct set of files in AA's possession to manufacture the SkyTracker III circuit boards, while the latter is *broader* because it

undisputedly includes the SkyTracker III source code. So neither AA's email, nor NASCorp's admission below, raises a genuine dispute about whether "release" imposed only an obligation to "send releases" to Comtech's subcontractors. Such a construction would nullify Comtech's undisputed obligation to release "all" the engineering files because there is no evidence the subcontractors ever possessed the SkyTracker III source code.

NASCorp, on the other hand, persuasively relies on the parties' emails exchanged before, and after, executing the Agreement. Specifically, in his June 18, 2013, email to Comtech, Humphrey stated, "In our discussion, you mentioned that our engineered property which we bought was going to have to be located." Humphrey then provided the list of files and items that Comtech needed to locate, which were "documented [as] being used when [NASCop] was helping [to] train Comtech staff" under their 2009 agreement. Humphrey went on: "In addition to the above, we need releases from Comtech for vendors." He later repeated himself: "Also, Advanced Assembly, SinotechUSA, Inc. and any other vendors will need a signed release from their NDAs with Comtech." Humphrey's separate demands for the files and for Comtech to release the subcontractors from their NDAs, and his use of the word "located" as it pertained to the files, indicates the parties understood these were two, different obligations. And contrary to Comtech's belated characterization of Humphrey's email as a separate arrangement the parties struck "prior" to entering the Agreement (which *coincidentally* obligated Comtech to "send a [CD] containing certain engineering documents"), Comtech already admitted this email "set[] forth in specific detail the [files] Comtech was required to provide to NASCorp *as part of the* [*Agreement*]."

Similarly, a day later, an internal Comtech email advised: "Here's a list of items [Humphrey] wants *from us.*" Another email presciently stated, "We want to make sure that all of these documents come to [Comtech] first *so that we can pull together a full 'package' to deliver*

*to* [*NASCorp*]. *I just don't want all our* sub[contractors] *sending documents directly to* [*Humphrey*]. I can't imagine what that would turn into." And Comtech's productions manager testified that, during this time, Comtech employees were directed to download from Comtech's project-management database every file Humphrey had requested and copy those files onto a CD to ship to NASCorp.

Two days after the parties signed the Agreement, an internal Comtech email advised: "We need to ship everything out to nascorp by 7/2." Another email directed: "[T]he list of things that NASCorp requested . . . [has] all been located and are in a CD . . . . The only things left are [to] . . . [p]ackage up the actual test fixture and ship to them." And, importantly, Comtech has always asserted that it shipped a package to NASCorp on July 2 with all the "engineering drawings and related information" it was obligated to "release" under the Agreement.

Comtech likewise acknowledges that, prior to entering the Agreement, NASCorp had already paid the invoices related to Comtech's engineering services. Those services included developing the engineering files for NASCorp. So it seems the parties envisioned that Comtech would return these proprietary files to NASCorp *and* allow the subcontractors to work with NASCorp in order to use these files for the next tranche of production. *See Williamson Cnty. Broad. Co.*, 987 S.W.2d at 552 ("The court should consider the entire contract, and the situation involving the parties, the nature of the business in which they are engaged and the subject matter to which the contract relates." (cleaned up)).

Considering the entire context of the Agreement, therefore, Comtech was undisputedly required to *transfer* "all SkyTracker III engineering drawings and related information to NASCorp"—not only to allow the subcontractors to continue working with NASCorp. This distinction is meaningful in practice. Although the subcontractors were authorized to work with

NASCorp, NASCorp was not obligated to work with them; yet, after it chose to work with its own subcontractor, NASCorp never received its proprietary source code from Comtech.

Comtech echoes its interpretative argument to claim that it performed under the Agreement, nonetheless, because NASCorp could have sought out any missing files from AA and Sinotech. It's true that, besides physically shipping them to NASCorp, Comtech could have "released" the engineering files in several ways—including through its subcontractors. But this misses the point. Other than NASCorp's admission that AA and Sinotech had all the files necessary to "manufacture" the SkyTracker III, Comtech has never identified evidence that either subcontractor transferred the SkyTracker III source code to NASCorp nor that they even possessed all the engineering files in the first place.

Comtech argues NASCorp forfeited any dispute about what specific files the subcontractors possessed by failing to raise the issue before the reconsideration stage. The district court partially agreed, holding that NASCorp improperly claimed for the first time on reconsideration that "software engineering files," like the SkyTracker III source code, were in the "exclusive domain of [Comtech]." Be that as it may, NASCorp sufficiently argued that Comtech failed to show *the subcontractors* possessed the "software engineering files," like the source code, when they were released from their NDAs. In its motion for summary judgment, Comtech argued that it "gave NASCorp another path to continue manufacturing its product" when it released its subcontractors from their NDAs. NASCorp's central argument in response was that Humphrey never received any "software engineering files," like the source code, *even though* he was able to obtain from AA "hardware engineering files" for the SkyTracker III circuit boards. This is essentially the same argument NASCorp raises on appeal.

Finally, we arrive back where we began: Comtech's shipment. The parties acknowledge that if Comtech shipped the CD to NASCorp, the package NASCorp received would have contained "all SkyTracker III engineering drawings and related information." Comtech claims it shipped a CD of all the engineering files; Humphrey claimed he never received that CD. Although both parties agree NASCorp received the package Comtech sent, they dispute *what* Comtech sent. This is enough to preclude summary judgment.

Comtech argues Humphrey's testimony is undermined by his statement in a July 18, 2013, email (thirteen days after he received the package), in which he notified Comtech that "[w]e have been going through the engineering items." Viewed in a light most favorable to NASCorp and Humphrey, however, this simply refers to the laptop and test fixture that Humphrey acknowledges he received and reviewed. This statement does not undisputedly show that NASCorp received the CD, especially considering Humphrey went on to say he was going to have an employee "sign-off on the engineering deliverables received." Comtech also points out that Humphrey only complained about the shipment after he received Comtech's dunning letter, but Humphrey testified he met with CES to discuss the missing files *before* he read the dunning letter. Finally, Comtech references Humphrey's email to CES, in which he explained that the files he provided CES "are straightforward" and that "Advanced AssemblyTM made production runs with those items." Humphrey, however, also said "[w]e are hoping . . . NASCorp [counsel] will be successful in recovery of our source codes from Comtech." Ultimately, NASCorp claims that Humphrey provided CES with the same package he received, and that CES gave that package to Executive Analytics. CES claims the package didn't include a CD, and Execution Analytics claims it never received the source code. On these facts, summary judgment is improper.

Comtech finally seeks to affirm the district court on the alternative ground that NASCorp failed to prove damages. This issue was not decided below and is not fully briefed before us. We therefore decline to affirm on this basis.

As NASCorp presented evidence that it never received the SkyTracker III source code, which Comtech admits NASCorp was owed, there remains a genuine dispute about whether Comtech performed under the Agreement. Accordingly, we reverse the district court's grant of summary judgment on this claim. Consequently, we deny as moot NASCorp's appeal of the order denying reconsideration of this claim.

## B. Lanham Act Claim

The district court also granted summary judgment on NASCorp's Lanham Act claim. NASCorp had claimed that Comtech manufactured, sold, and/or provided monthly monitoring services for pirated SkyTracker III devices in violation of the Lanham Act. The Lanham Act imposes liability on "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A). A plaintiff must show that: "(1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 794 (6th Cir. 2015) (citing *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009)).

NASCorp's claim is based on four facts: (1) Comtech ordered an additional 1,377 unaccounted-for plastic enclosures; (2) roughly the same number of two other component parts were shipped to an address NASCorp had previously vacated; (3) the invoices for these component parts named the recipient as "North American Satellite," not "North American Satellite

Corporation"; and (4) Comtech was the only manufacturer with authority to order component parts for the SkyTracker III and provide monitoring services for them. From these facts, NASCorp claims that Comtech used a shadow entity named "North American Satellite" to manufacture and sell pirated SkyTracker III devices or provide illegal monthly monitoring services for them.

Comtech rightly notes there is no evidence of who received these additional component parts; whether Comtech received them; whether they were later combined with the missing enclosures and other essential parts to produce SkyTracker III devices; and, most importantly, whether Comtech ever sold counterfeits in commerce or provided monitoring services for them. *See Moldowan*, 578 F.3d at 374 ("If the moving party . . . does not bear the burden of proof at trial, . . . [it] may meet its burden by showing 'that there is an absence of evidence to support the nonmoving party's case." (citation omitted)). And NASCorp even admits it has never seen a pirated unit for sale in commerce. *Cf. Grubbs*, 807 F.3d at 794. We therefore affirm the district court's grant of summary judgment on this speculative claim. Also, because NASCorp only addresses the reconsideration-order as it relates to the breach of contract claim, NASCorp waived review of that order as it relates to the Lanham Act claim. *See, e.g.*, *Robert N. Clemens Tr. v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 853 (6th Cir. 2007). We therefore affirm that order, as well.

## CONCLUSION

For the foregoing reasons, we **REVERSE IN PART AND AFFIRM IN PART** the order granting summary judgment, and we **AFFIRM IN PART** the order denying reconsideration and **DENY IN PART** the appeal of that order.